UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE
2004 JUN 24  P 3: 45

U.S. DISTRICT COURT
DISTRICT OF MASS.

| | |
|---|---|
| THE GILLETTE COMPANY, | )<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | ) Civil Action No. 04 Civ. 11222 (MLW) |
| RECKITT BENCKISER, INC., | )<br>)<br>) |
| Defendant. | )<br>) |

### DECLARATION OF JAMES M. SPEARS IN SUPPORT OF OPPOSITION OF THE GILLETTE COMPANY TO DEFENDANT RECKITT BENCKISER, INC.'S MOTION TO TRANSFER

James M. Spears, having been duly sworn, hereby deposes and states as follows:

1. I am a member of the law firm of Ropes & Gray, LLP, counsel to Plaintiff The Gillette Company ("Gillette") in this action and in a parallel declaratory judgment action filed by Defendant Reckitt Benckiser, Inc. ("Reckitt") in the United States District Court for the Southern District of New York ("the Reckitt action"). In this action, Gillette seeks injunctive relief and damages arising out of a scheme of false, deceptive, and misleading advertising, branding, and packaging perpetuated by Reckitt. In the Reckitt action, Reckitt seeks, among other things, a declaration that its advertising materials are not false and misleading. I make this declaration in support of Gillette's opposition to Reckitt's motion to transfer this action to the Southern District of New York. The facts contained herein are true and correct to the best of my knowledge, information, and belief.

7189412.1

## The Parties And Their Competing Products

2. Gillette is a corporation organized and existing under the laws of the State of Delaware and having its principal place of business in and around Boston, Massachusetts.

3. Gillette is the recognized world leader in the development and marketing of razors and shaving cartridges. Among Gillette's successful brands is the Venus® shaving system for women, which consists of a patented blade and razor design and related shaving accessories.

4. As alleged in its complaint in the Reckitt action, attached hereto as Gillette's Exhibit 1, Reckitt is a corporation organized and existing under the laws of the State of New Jersey and having its principal place of business in Parsippany, New Jersey.

5. Reckitt markets and distributes a line of depilatory products for women under the brand name "VEET". The VEET product line includes VEET "Rasera" and VEET Mousse.

6. As alleged in its complaint in the Reckitt action (*see* Ex. 1 at ¶ 9), Gillette and Reckitt directly and actively compete in the market for women's hair removal products.

## Reckitt's Recent Advertising Campaign

7. As confirmed in Reckitt's complaint (*see* Ex. 1 at ¶ 36), Reckitt, on or about April 5, 2004, commenced a nationwide television advertising campaign in connection with the launch of a new product, called the VEET "Rasera," in the United States. The "Rasera" product consists of a container of depilatory cream packaged

together with a plastic spatula or scraper shaped like a razor, which Reckitt has branded as the "Bladeless Razor™".

8. Reckitt's advertising for the VEET "Rasera" product is exemplified by a thirty-second television commercial (the "'Commercial'"), which has appeared and continues to appear on national network and cable television broadcasts. This is one of the two commercials that are the subject of both Gillette's complaint in this action and Reckitt's declaratory judgment complaint. A facsimile of the VEET "Rasera" product packaging is attached to Gillette's complaint as Exhibit A, and CD-ROM's containing the VEET commercials (and associated storyboards) are attached to Gillette's complaint as Exhibits B and C.

9. On or about May 3, 2004, approximately one month after launching its advertising campaign for the "Rasera" product, Reckitt launched another national television advertising campaign, the subject of which was its preexisting VEET Mousse depilatory product. *See* Defendant Reckitt Benckhiser, Inc.'s Motion to Transfer and Memorandum of Law ("Transfer Motion") at 4.

10. Reckitt's new advertising for the VEET Mousse product is illustrated by a thirty-second television commercial (the "Mousse Commercial"). This is the second of the two commercials that is the subject of Gillette's complaint (as well as Reckitt's declaratory judgment complaint) and is attached to Gillette's complaint in CD-ROM form as Exhibit C.

### Gillette's Response To Reckitt's Advertising Campaign

11. On or about April 15, 2004, ten days after Reckitt launched its national advertising campaign for the "Rasera" product, Gillette engaged this firm to review that advertising and Reckitt's related branding and packaging practices and to advise

Gillette regarding possible claims against Reckitt for false and misleading advertising under federal and state law.

12. As part of this firm's review, consultants were retained to begin analysis of consumer reactions to the "Rasera" advertising, branding, and packaging.

13. Shortly thereafter, following Reckitt's May 3, 2004, launch of its new national advertising campaign for its Mousse product, Gillette engaged this firm to review that advertising and to advise Gillette regarding possible claims against Reckitt for false and misleading advertising under federal and state law.

14. On Wednesday, May 26, 2004, I sent a demand letter to William R. Mordan, who I understand to be Reckitt's chief legal counsel in the United States, outlining Gillette's position that the VEET advertising constituted false and misleading advertising in a number of respects, described with specificity in the letter. The demand letter is attached hereto as Gillette's Exhibit 2. The letter also emphasized that, while Gillette was certainly willing to discuss its concerns with Reckitt, Gillette had instructed my firm to "move expeditiously in the event that some sort of reasonable accommodation cannot be quickly reached." Ex. 2 at 4.

15. On Thursday, May 27, 2004, I sent an additional letter to Mr. Mordan reiterating the urgency of the situation and advising him that Gillette had authorized our firm to initiate appropriate legal proceedings in the event that we did not receive a substantive response to the demand letter on or before June 2, 2004. A true and correct copy of the May 27th letter is attached hereto as Gillette's Exhibit 3.

16. On Friday, May 28, 2004, I received a telephone call from Mark Fowler, who identified himself as outside counsel for Reckitt. I returned that call with my

partner, Peter Brody. Mr. Fowler informed us that Reckitt would not be able to provide a substantive response to Gillette's demand letter by the June 2nd deadline, because of the intervening Memorial Day holiday and the large number of individuals, both in the United States and the United Kingdom, that had to be consulted before a response could be made, but that he expected that Reckitt would be in a position to respond shortly thereafter. Mr. Fowler also indicated that he would contact me again on or before June 2nd to inform me as to when we could expect a substantive response to the demand letter.

  17. Believing, based upon Mr. Fowler's representations, that Reckitt was acting in good faith to investigate and address the issues raised in the demand letter, I told Mr. Fowler that we would wait to hear from him on or before June 2nd and would not initiate legal proceedings or take other legal action against Reckitt prior to that date. I again reiterated, however, that this was a matter of great urgency for Gillette and that Gillette stood ready and willing to initiate legal proceedings should Reckitt fail to adequately respond to the demand letter. I noted to Mr. Fowler that Reckitt's advertising campaign was timed to coincide with the beginning of the peak season for sales of women's hair removal products and that this was one of the main reasons for Gillette's need to resolve the dispute promptly. Mr. Fowler responded that he understood and appreciated that need. I also noted to Mr. Fowler that Gillette had instituted legal action against Reckitt in Europe when similarly false and misleading advertising was unveiled there and that Gillette would not hesitate to pursue similar action in the United States. Mr. Fowler stated that he was aware of the European

litigation. Indeed, it is discussed in Reckitt's declaratory judgment complaint in paragraphs 34 and 35. *See* Ex. 1, ¶¶ 34-35.

18. On Wednesday, June 2, 2004, I received another telephone call from Mr. Fowler, which I again returned with Mr. Brody. During this conversation, Mr. Fowler requested that we schedule a telephone conference to discuss possible resolution of the parties' dispute. Mr. Fowler stated that Reckitt wanted the conference to include in-house representatives of Gillette and Reckitt, in order to make the call "productive." Based on these statements, and Reckitt's desire to include in-house representatives of the parties, I inferred that Reckitt intended to make a substantive response to Gillette's demand letter, and on that basis, I agreed to facilitate a telephone conference. We tentatively scheduled the telephone conference for the morning of Thursday, June 3, 2004; however, the appropriate Gillette personnel were not available that day. Therefore, the telephone conference was rescheduled for Friday, June 4, 2004 at 3:00 P.M.

19. Unbeknownst to me, Reckitt and its attorneys were using the extra time granted to them, in good faith and in response to Mr. Fowler's request, *not* to investigate Gillette's concerns and prepare a substantive response thereto, but rather to prepare Reckitt's declaratory judgment complaint. In fact, the complaint served on Gillette in the Reckitt action was signed and dated on June 3, 2004, the day before the "settlement conference" with Gillette took place. It now appears that Reckitt sought additional time to respond to Gillette's demand letter for the sole purpose of preparing its declaratory judgment complaint and preempting Gillette's lawsuit in this Court.

20. The Friday, June 4, 2004 telephone conference began at approximately 3:15 P.M. Mr. Fowler and Mr. Mordan, among others, participated on behalf of Reckitt. I, my partner Peter Brody, and Kevin Loftus, Deputy General Counsel of Gillette, among others, participated in the call on behalf of Gillette.

21. After introductions, Gillette asked Reckitt to respond to the concerns raised in the demand letter. To our surprise (although in retrospect it is not puzzling), Reckitt responded by categorically dismissing each of Gillette's concerns, arguing that consumers were unlikely to be confused by the VEET advertising and disputing the need for any remedial measures. Reckitt dismissed Gillette's successes in the European litigations as irrelevant to the U.S. dispute. Reckitt indicated that it was not inclined to engage in any substantive discussion of the issues raised in the demand letter nor any remedial measures they would be willing to take or consider.

22. Reckitt then asked what evidence Gillette had to support Gillette's claim that U.S. consumers were, in fact, confused by the VEET advertising and if Gillette would be willing to disclose such evidence to Reckitt. Gillette responded that it had evidence of a preliminary nature and agreed to consider the possibility of disclosing such evidence to Reckitt at an appropriate juncture. Gillette noted, however, that Reckitt's initial and very hostile response to Gillette's demands did not suggest that such disclosure would be productive and that Gillette was not interested in providing "free discovery" to Reckitt if litigation was to ensue in any event.

23. Gillette then specifically asked Reckitt if it was willing to make a proposal to resolve *any* of the concerns raised in the demand letter without any further action on

Gillette's part. Reckitt's representatives responded that they were not sure and would get back to Gillette.

24. To avoid prejudice to Gillette while Reckitt considered that question, Gillette asked Reckitt whether it would be willing to enter into a tolling agreement whereby Reckitt agreed not to raise any delay caused by further settlement negotiations as a defense should Gillette seek a preliminary injunction in its contemplated lawsuit against Reckitt. Gillette asked that Reckitt notify Gillette *by close of business that day (Friday, June 4)* whether Reckitt would agree to such a tolling agreement. Reckitt agreed to do so. The conference call then ended.

25. At approximately 4:20 P.M., I received a telephone call from Mr. Fowler, which I returned with Mr. Brody present. Mr. Fowler was joined by one or more of his colleagues. Mr. Fowler and his colleagues informed me that Reckitt would not enter into a tolling agreement and thought that the parties were "too far apart" for further settlement discussions to be productive. As Reckitt admits in its Transfer Motion, Reckitt's attorneys then advised me that Reckitt "would take all steps necessary to protect its rights and acknowledged that Gillette might do the same." Transfer Motion at 5.

### The Filing Of The Actions

26. Sometime before 5:00 p.m. that same day, Reckitt, through Fowler's firm, electronically filed its pre-prepared and signed declaratory judgment complaint in the Southern District of New York. Reckitt did not mention the complaint or the fact that it had been (or was about to be) filed during any of the June 4th telephone conferences. In fact, we did not receive any notification of the filing of Reckitt's complaint from Mr.

Fowler (or anyone else representing Reckitt) until several days after the complaint was filed.

27. Over the weekend, Gillette, not knowing about Reckitt's filing of the declaratory judgment complaint, readied its own complaint for filing in this Court. At 8:30 a.m. on that Monday, June 7, 2004, Gillette filed its complaint in this action, alleging violations of the Lanham Act and the Massachusetts Consumer Protection Act. The factual allegations and legal theories contained in the complaint mirror the demand letter in all material respects. In other words, the complaint filed by Gillette in this action is essentially the same complaint that Gillette told Reckitt on several occasions it would file if the parties could not agree to an amicable resolution of their dispute.

28. Gillette filed its action in the District of Massachusetts because that is where Gillette is headquartered and because that is where Gillette's fact witnesses reside, including witnesses who will testify about the economic harm that Reckitt's false and misleading advertising has caused and will cause Gillette.

29. As a courtesy, I telephoned Mr. Fowler immediately after this action was filed to notify him of the filing. I did not reach him but left a message informing him of the filing. Sometime later that morning, Gillette learned, through its own sources – and not from Reckitt or its counsel – that Reckitt had filed its declaratory judgment complaint in the Southern District of New York the previous Friday afternoon. Subsequently, Ropes & Gray office staff, at my direction, contacted the court clerk's office to inquire about the exact time of filing of Reckitt's complaint. They were informed that Reckitt's complaint was filed sometime before 5:00 P.M. on Friday afternoon. Neither Mr. Fowler nor any Reckitt representative notified me or any other

Gillette representative of the filing of Reckitt's complaint until the afternoon of June 7th, when Mr. Fowler returned my call from early that morning and mentioned the filing, which by then Gillette had learned about through other channels.

30. Gillette's complaint was served on Reckitt's registered agent for service of process in Massachusetts on the same day it was filed in court, June 7, 2004. Two days later, on June 9, 2004, Reckitt's complaint was served on Gillette via service on the New York State Secretary of State. As Reckitt acknowledges in its Transfer Motion, the factual and legal issues in the two actions are "identical," except that this action includes a claim under the Massachusetts Consumer Protection Act. *See* Transfer Motion at 8-9.

31. On June 10, 2004, Reckitt filed its Transfer Motion, made pursuant to 28 U.S.C. § 1404(a). The motion is largely predicated on Reckitt's filing of its anticipatory declaratory judgment action and on the assumption that this action will proceed. *See* Transfer Motion at 7-9.

32. Gillette's answer to the complaint in the Reckitt action is due on June 29, 2004. However, on June 23, 2004, Gillette filed a motion seeking a dismissal or a stay of Reckitt's lawsuit in the Southern District of New York. A copy of that motion is attached hereto as Gillette's Exhibit 4.

I declare under penalty of perjury that the foregoing is true and correct. Executed on June 22, 2004.

*James M. Spears*

-10-

7189412.1